IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ANSELMO JIMENEZ,<br><br>                Petitioner,<br><br>vs.<br><br>ROB JEFFREYS,<br><br>                Respondent. | 8:21CV261<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Petitioner Anselmo Jimenez's ("Jimenez" or "Petitioner") Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Filing No. 1. Respondent submits that Jimenez's petition should be dismissed with prejudice as his habeas claims are procedurally defaulted. For the reasons that follow, Jimenez's petition is denied, and this case is dismissed with prejudice.

## I. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

**A. Conviction and Sentence**

On September 27, 2019, Jimenez was convicted by a jury in the District Court of Douglas County, Nebraska, of first degree sexual assault of a child. Filing No. 20-5 at 135. On February 10, 2020, the state district court sentenced Jimenez to 25 to 30 years in prison. *Id*. at 148–49. The Court recites the following relevant facts from the Nebraska Court of Appeals' direct appeal opinion in *State v. Jimenez*, No. A-20-149, 2021 WL 194172 (Neb. Ct. App. Jan. 14, 2021) (Filing No. 20-2). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

D.C., who was 13 years old at the time of trial, testified. She explained that Jimenez is her uncle (married to her aunt) whom she has only met twice. The first time that Jimenez visited, D.C. was around seven or eight. When Jimenez visited in Nebraska, he and his family stayed with D.C.'s family. She testified that while she was watching television in her mother, Diocelina's bedroom, Jimenez came in. He closed the door. He asked D.C. to reach for something and put her on his shoulders. After putting her on his shoulders, he threw D.C. on the bed and then started touching her vagina. Upon further questioning, D.C. explained that this touching occurred on top of her clothing. The touching continued until someone knocked on the door, at which time Jimenez opened the door and left.

D.C. testified to another incident with Jimenez that occurred when Jimenez and his family visited a second time when she was still in elementary school. She was cleaning her room with her sister and two cousins. At some point, her sister and her cousins left the room, leaving her alone. D.C. testified that Jimenez came up the stairs and entered her bedroom, closing and locking the door behind him. He then grabbed her and put her on the bed where he laid her on her back. He then took off her pants and her underwear. D.C. explained that Jimenez put his fingers in her vagina and moved his fingers inside her vagina causing her pain. Jimenez, who had removed his shorts, but not his underwear asked her to touch his penis. She refused his request. D.C. then heard footsteps, at which point, Jimenez unlocked the door and left. Before he left, he told her not to tell anyone what had occurred.

Following the second visit, she refused to say goodbye to Jimenez when he and his family left because she was scared of him. She did hug and say goodbye to her

aunt and cousins. Following their departure, she experienced pain in the vaginal area when she used the bathroom.

At some point in time thereafter, she learned her parents were planning a visit to North Carolina where Jimenez and his family lived. She cried and informed them she did not want to go. Her reason for not wanting to go was because she was afraid that he would touch her again. However, she did not inform her parents of the reason for her resistance.

Following her learning that her parents were planning a trip to see her aunt and uncle, she also began to have more frequent asthma attacks. During these attacks, she would struggle to breathe. She stated that she would either have to use her inhaler or go to the hospital to gain relief. She did not remember having these asthma attacks resulting in trips to the hospital prior to her uncle's visits. She testified that on one occasion following Jimenez's visits, she tried to kill herself. During this time, she did not want to live anymore. Testimony of her therapist indicated that her suicidal ideation occurred after she had disclosed what happened to her.

D.C. initially disclosed what occurred to her to a doctor. She went to the doctor for a checkup and she began to cry. She then asked Diocelina to leave the room so she could talk to the doctor. She disclosed to the doctor what had occurred with Jimenez. She told her mother and father what had happened after disclosing it to the doctor. She was later interviewed by personnel at Project Harmony where she again described what had occurred with Jimenez. Project Harmony is a child advocacy center that serves children who have made allegations of abuse. During the pendency of the case, she also described what happened to her in a deposition taken by prior defense counsel.

The deposition spanned two dates as during the initial session, she became light headed and passed out.

On cross-examination, D.C. conceded that some of the answers that she provided during direct examination were different than the answers she provided during her interview at Project Harmony. In her interview, she stated that she kicked her uncle in the groin, but at trial she testified only to attempting to kick him. In her interview, she stated that Jimenez forced her to touch his penis. At trial, she first maintained that she did not touch Jimenez's penis and then testified that she did not remember if she touched Jimenez. During her interview, she stated that in the first incident, Jimenez sat on top of her, but on direct examination she testified that he sat next to her. When confronted with the inconsistency on cross-examination she stated that he did sit on top of her initially, but then sat next to her on the bed. She also conceded that she never, before, stated that she was on Jimenez's shoulders prior to the first incident. Contrary to her testimony on direct, on cross-examination, she stated that she saw her doctor for her checkup prior to knowing about the trip to North Carolina to visit Jimenez where he lived. She stated that she saw her parents packing their suitcases shortly after the doctor's appointment. However, upon further questioning, she stated that she did not remember when she saw the doctor, in relation to finding out about the trip to North Carolina. On redirect examination, she explained that it was difficult for her to remember these incidents.

D.C.'s younger sister, Da.C., her mother, Diocelina, and Fausto, D.C.'s father, all testified on behalf of the State. Da.C. was 12 years old at the time of trial. She recalled only one visit by Jimenez to Nebraska. While she was unable to identify Jimenez in the

courtroom, both Diocelina and Fausto were able to positively identify Jimenez during their testimony. Da.C. did recall an incident where she, D.C., and their two cousins were cleaning their bedroom. She and her two cousins left the room to go outside and play leaving D.C. in the room alone. When she returned to the room, she observed D.C. sitting at the edge of the bed and crying. She testified that D.C. would not tell her why she was crying at that time.

Diocelina testified that Jimenez and his family visited Nebraska two times. She believed the first visit was in July 2012 and lasted approximately one week. The second visit lasted for about 10 days. Diocelina was unsure of the dates of the second visit, but it was also during the summer and occurred after her family had moved to a different address. Fausto believed the second visit occurred in July 2014 or 2015.

Both of D.C.'s parents testified as to behavior changes that occurred with D.C. after Jimenez's second visit. According to Fausto, D.C.'s behavior changed so significantly that she was not the same girl that he knew. He explained that D.C. began to act more rebellious and rude toward both her parents. Diocelina testified that after Jimenez's second visit, D.C. began to complain that she was experiencing pain in her vagina. Diocelina bought D.C. some ointment to help with the pain. On cross-examination, however, Diocelina conceded that she had taken D.C. to the doctor for vaginitis in 2010 as well after D.C. complained of vaginal pain. Both Fausto and Diocelina testified to D.C.'s diagnosis and history of asthma attacks since she was a small child. Both testified that the attacks had become more frequent since the second visit by Jimenez with D.C. complaining of chest pain. Fausto believed that they had been required to take D.C. to the hospital since Jimenez visited. Diocelina testified that

they had taken D.C. to the hospital several times due to severe asthma attacks but was not clear as to whether any of the hospital visits postdated Jimenez's second visit. Fausto also explained that after her initial deposition, D.C. appeared very upset and appeared to be about to pass out.

According to Fausto, he and Diocelina began talking about going to North Carolina approximately one month after Jimenez's second visit. Diocelina testified that while a conversation did occur soon after the visit, she and Fausto did not discuss making firm plans to travel until between one to two years following the visit. Fausto and Diocelina both testified that D.C. began to cry when she learned of these plans. They also stated that D.C. began to complain to them about pains in her chest. It was because of these pains in her chest that they decided to take D.C. to the doctor. While at the doctor's office, Diocelina was asked to leave the room and when she returned, D.C. was crying. The doctor informed Diocelina of D.C.'s disclosure of the sexual assault and provided telephone numbers for resources to assist the family in dealing with the assault. Diocelina telephoned these resources in addition to calling law enforcement. After D.C. and Diocelina returned home from the doctor's appointment, Fausto observed both of them to be crying. Police were called and an interview at Project Harmony was arranged.

The State also called as witnesses Nathan Dickey, a former police officer of the Omaha Police Department (OPD) and Jeffrey Shelbourn, a detective within the special victims unit of OPD who investigated the sexual assault. They noted that D.C.'s disclosure had occurred several years after the alleged assaults. Jimenez, 40 years old at the time of the report, was identified as the perpetrator of the assault. Shelbourn was

able to determine Jimenez was in Omaha at the time of the assaults because fishing permits had been issued in his name during the relevant dates. State records revealed that Jimenez purchased single day fishing permits on July 27, July 30, and August 1, 2012. Jimenez purchased a full season fishing permit on July 11, 2014. When Shelbourn was asked to identify Jimenez in the courtroom, he was able to do so. Shelbourn also witnessed D.C.'s interview at Project Harmony and he testified that during this interview, D.C. stated her uncle was the one who committed the assault, but she was unable to provide her uncle's name.

In his defense, Jimenez called his wife, Sandra Ozuna, as a witness. Sandra explained that they came to Nebraska in 2012 where they stayed with her sister, Diocelina, and her family. She explained that Jimenez did not spend time with D.C. alone. She testified that Jimenez went fishing all three days that they stayed in Nebraska in 2012. She also testified that when they returned to Nebraska in 2014, Jimenez went fishing every day during the week that they were there. She did note that the fishing trips typically involved fishing through the night. Fausto testified that he participated in some of the fishing trips when he was not working. He testified that they typically began fishing in the evening and did not return until early morning. He agreed that Jimenez and Jimenez's son went fishing on additional occasions.

Based on the evidence presented, the jury returned a guilty verdict against Jimenez, and the state district court sentenced him on February 10, 2020, as stated above.

7

**B. Direct Appeal**

Jimenez, with his trial counsel, filed a direct appeal, alleging that the evidence was insufficient to support the guilty verdict and that he received an excessive sentence. Filing No. 20-3 at 6; Filing No. 20-5 at 155. On January 14, 2021, the Nebraska Court of Appeals entered a Memorandum Web Opinion rejecting Jimenez's assignments of error and affirming his conviction and sentence. Filing No. 20-2. Jimenez did not petition the Nebraska Supreme Court for further review. Filing No. 20-1 at 4. The mandate issued on February 18, 2021. Id.

**C. Postconviction Proceedings**

Jimenez has not filed a motion for postconviction relief in the state district court. Filing No. 1 at 3.

**D. Federal Habeas Petition**

Jimenez filed his habeas petition in this Court on July 12, 2021. Filing No. 1. Jimenez's habeas claims were summarized by this Court in its preliminary review of the petition as follows:

> Claim One:    Petitioner was unlawfully arrested by an immigration officer.
>
> Claim Two:    There is insufficient evidence to support Petitioner's conviction because Petitioner had never spoken with Detective Jeffrey Shelbourn before he identified Petitioner at trial and Detective Jeffrey Shelbourn falsely testified that Petitioner bought fishing permits in 2012 and 2014.
>
> Claim Three: Petitioner's counsel failed to contact witnesses identified by Petitioner.

Filing No. 9 at 1.

In response to the petition, Respondent initially filed a Motion and Notice of Mixed Petition, Filing No. 13, and, from that, the Court determined that Jimenez's

8

petition was a mixed petition containing both exhausted and unexhausted claims. Specifically, the Court determined that Claims One and Two were exhausted, but Claim Three was unexhausted as Jimenez had not filed a motion for postconviction relief. Filing No. 17 at 4–5. The Court gave Jimenez an opportunity to elect to either dismiss his petition without prejudice in order to exhaust all of his claims or to proceed only on his exhausted claims. *Id*. at 6–8. On February 2, 2022, Jimenez elected to proceed on only his exhausted claims, Claims One and Two, and the Court dismissed Claim Three without prejudice and progressed this matter. Filing No. 18; Filing No. 19.

Respondent filed an answer, Filing No. 21, the state court record, Filing No. 20, and a brief, Filing No. 23. Jimenez did not file a brief in response, and Respondent filed a notice of case submission, Filing No. 23, on May 18, 2022. This matter is ripe for disposition.

## II. DISCUSSION

Respondent argues that both Claims One and Two are procedurally defaulted. Filing No. 22 at 5–8. Upon review, the Court agrees.

### A. Applicable Legal Standards

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

    (A) the applicant has exhausted the remedies available in the courts of the State; or

    (B) (i) there is an absence of available State corrective process; or

        (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

9

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to either the Nebraska Supreme Court directly[1] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. See Akins v. Kenney, 410 F.3d 451, 454–55 (8th Cir. 2005).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" Armstrong v. Iowa, 418 F.3d 924, 926 (8th Cir. 2005) (quoting Gray v. Netherland, 518 U.S. 152, 162 (1996)). Stated another way, if a habeas claim

---

[1] The Court notes that where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106.

10

has not been presented to the Nebraska appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *Akins*, 410 F.3d at 456 n.1.

In addition, "[t]he Nebraska Postconviction Act, Neb. Rev. Stat. § 29-3001 *et seq*. (Reissue [2016 & Supp. 2023]), is available to a defendant to show that his or her conviction was obtained in violation of his or her constitutional rights," however, "the need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity." *State v. Sims*, 761 N.W.2d 527, 533 (Neb. 2009). "A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."). Furthermore, in 2011, the Nebraska Legislature created a one–year time limit for filing a verified motion for postconviction relief. *See* Neb. Rev. Stat. § 29–3001(4); *State v. Smith*, 834 N.W.2d 799, 801 (Neb. 2013).

**B.  Claims One and Two are Procedurally Defaulted**

Applying the foregoing legal principles here, it is clear that both Claims One and Two are procedurally defaulted as neither claim was presented through one complete round of Nebraska's appellate review process. Jimenez's allegation in Claim One that he was unlawfully arrested by an immigration officer could have been raised on direct appeal, but it was not. *See* Filing No. 20-3. As for Claim Two, Jimenez did raise this insufficient evidence claim on direct appeal, but he failed to present that claim in a

11

petition for further review to the Nebraska Supreme Court after the Nebraska Court of Appeals rejected it. Because both Claim One and Claim Two could have been or were litigated on direct appeal, Jimenez cannot now raise these claims in a state motion for postconviction relief. Jimenez would also be time-barred from presenting such claims in a postconviction motion as more than one year has passed since his direct appeal mandate issued. See *State v. Koch*, 933 N.W.2d 585, 589 (Neb. 2019) (one-year limitations period for filing motion for postconviction relief begins to run on date appellate court issues its mandate affirming defendant's conviction on direct appeal). As such, Jimenez's habeas claims are procedurally defaulted.

## C. No Cause and Prejudice or Miscarriage of Justice to Excuse Default

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here, Jimenez has not shown, let alone argued, that any cause and prejudice exists to excuse the procedural default of his habeas claims, and the Court's independent review of the records reveals none. The Court also concludes, again after careful review of the record, that the miscarriage of justice exception does not apply to excuse the default of Jimenez's habeas claims as Jimenez has not made any "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup v. Delo*, 513 U.S. 298, 327

(1995)). Accordingly, Jimenez's habeas claims must be dismissed with prejudice. *Armstrong*, 418 F.3d at 926–27 (dismissal with prejudice is appropriate where the ground for dismissal is procedural default).

### III. CERTIFICATE OF APPEALABILITY

"[A] state prisoner seeking a writ of habeas corpus" under § 2254 cannot appeal the denial of his petition without first obtaining a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) (citing 28 U.S.C. § 2253); Fed. R. App. P. 22(b). This Court cannot grant such a certificate unless Jimenez "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To do that, Jimenez "must demonstrate that reasonable jurists would find [this] [C]ourt's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Jimenez has not made that showing, and this Court will not issue a certificate of appealability.

IT IS THEREFORE ORDERED that:

1. Jimenez's petition, Filing No. 1, is denied and dismissed with prejudice.

2. The Court will not issue a certificate of appealability in this matter.

3. The Court will enter a separate judgment.

Dated this 9th day of October, 2024.

BY THE COURT:

Joseph F. Bataillon
Senior United States District Judge